J-S11032-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.H.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: W.J.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1598 WDA 2025 |

Appeal from the Order Entered November 26, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000035-2025

BEFORE:  LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED: April 29, 2026**

W.J.F. (Father) appeals from the order, entered in the Court of Common Pleas of Allegheny County, Orphans' Court Division, involuntarily terminating his parental rights to his daughter, Z.H.G. (Child) (born November 2021). After careful review, we affirm on the basis of the opinion, authored by the Honorable David L. Spurgeon, with respect to involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b).

Allegheny County Office of Children, Youth, and Families (CYF) first became involved with Child's family in April 2023 when Child's mother, A.A.,[1] was found passed out on a bench with Child in a baby carriage.  ***See*** N.T. Termination Hearing, 10/23/25, at 18-19.  Mother, who was intoxicated, tried to flee when police and paramedics responded to the scene.  ***Id.*** at 19.  In the

---

[1] The court also involuntarily terminated Mother's parental rights to Child.  She is not a party to this appeal.

process of fleeing, Mother let go of the baby carriage. *Id.* Police officers grabbed the carriage before it entered oncoming traffic. *Id.* Following an emergency shelter care hearing[2] held on April 14, 2023, Child was placed with a foster family, with whom she resided at the time of the termination hearings. *Id.* at 19, 67.

Child was adjudicated dependent on June 7, 2023. At the adjudicatory hearing, which Father attended, Father was ordered to contact the agency, participate in visits with Child, and work with an engagement specialist. *Id.* at 24, 32. Because Father did not provide CYF with his address, he was never assessed for services. *Id.*

Father moved out of state around October 2023 and returned to Pennsylvania for one month in January 2024. *Id.* at 34, 77. Father then moved back to Florida from February 2024[3] through April 2025, when he returned to Pennsylvania. *Id.* at 77-78. On March 14, 2025, CYF filed a petition to involuntarily terminate Father's parental rights to Child. Father moved out of state again in September 2025 and failed to communicate with CYF. *Id.* at 32-33, 35.

_____

[2] Father did not attend because his whereabouts were unknown. *Id.* at 20.

[3] On June 26, 2024, the court entered an aggravated circumstances order against Father, concluding he had failed to maintain substantial and continuing contact with Child for a period of six month and finding that no efforts were to be made to reunify Child with Father. *Id.* at 27; *see also* Aggravating Circumstances Order, 6/26/24, at 1; 42 Pa.C.S.A. § 6302(1)(ii) (defining "Aggravating Circumstances"); *id.* at § 6341(c.1).

The court held a two-day termination hearing[4] in October and November 2025. At the October 2025 termination hearing, CYF caseworker Kristian Levan testified Father had not had any visits with Child until "recently," when he visited her four times with Mother.[5] *Id.* at 28. *See also id.* at 43 (Father did not start visiting Child until June 9, 2025); *id.* at 55-56 (Father did not visit Child from August 2025 to September 2025 or from September 8, 2025 to October 20, 2025). However, Wesley Family Services foster care coordinator Christelle Deffenbaugh testified that Father and Child interacted well during visits and that it seemed as though there was a "type of bond" between them. *Id.*

CYF permanency caseworker Heidi Hyson testified that her role is to work on finding an adoptive home for Child. *Id.* at 68. She testified that foster mother is very bonded with Child, meets all of Child's emotional, physical, and medical needs, and is very hands-on with Child. *Id.* at 65-67.

---

[4] Erin Krotoszynski, Esquire, an attorney with KidsVoice, a nonprofit agency that provides legal representation for children in Allegheny County Juvenile Court dependency matters, served as Child's legal counsel and guardian *ad litem* (GAL) at the termination hearing. *See* 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings); *In re K.R.*, 200 A.3d 969 (Pa. Super. 2018) (en banc), *but see In Re: T.S., E.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."). Attorney Krotoszynski told the court that KidsVoice could represent then-three-year-old Child without any conflict. *See* N.T. Termination Hearing, 11/25/25, at 4.

[5] Father never had any one-on-one visits with Child since she was adjudicated dependent. *Id.* at 43.

Caseworker Hyson also testified that she would recommend foster mother as an adoptive resource for Child. *Id.* at 67.

Father testified that he and Mother lived with Child for five months following Child's birth. *Id.* at 70. In July 2022, Father moved to Florida after he was released from serving a jail term in Pennsylvania and had "lost [his] apartment[,] didn't know where [Mother] was[, and] lost [C]hild." *Id.* at 70, 75. Father returned to Pennsylvania in June 2023 and left the Commonwealth again in October 2023 for work reasons. *Id.* at 73. At that time, Father testified he did not have a telephone number, but did have email, and was unaware that he could have contacted CYF to arrange for virtual visits with Child. *Id.*

Forensic psychologist Dr. Eric Bernstein testified that in June, July, and August 2025, he conducted individual and group evaluations—one with Child and Mother, another with Child and foster mother, and individual evaluations with Mother and Father. *Id.*, 11/25/25, at 34-35. Doctor Bernstein also submitted an addendum to the evaluations on September 26, 2025. Based on his observations, Dr. Bernstein testified that Child and foster mother have a secure attachment, Child's foster home is a safe environment, and that he had no safety concerns with regard to Child being in foster mother's care. *Id.* at 36-37.

With regard to Father, Dr. Bernstein noted that Father had not been a part of Child's life for approximately 15 months and that he had concerns about Father's lack of consistent involvement with Child and his ability to

parent. *Id.* at 39-40. Doctor Bernstein also testified he was concerned about Mother and Father's unstable relationship and how it would "impact his role as a father to [Child], especially[] when there are remaining concerns and questions about [intimate partner violence (IPV)]." *Id.* at 40. In his addendum, Dr. Bernstein "remained unable to address [Father's] permanency and reunification with [Child]." *Id.* at 46. Because Dr. Bernstein did not have a chance to observe Father and Child interact, he could not better assess whether termination of Father's rights would be in Child's best interests. *Id.* at 54.

At the time of the termination hearings, Father had not completed any of his court-ordered goals, which included attending an IPV program,[6] and had never achieved anything above minimal compliance and progress throughout the life of the case. *Id.*, 10/23/25, at 29-30. Father failed to maintain contact with CYF throughout the life of the case. *Id.* at 25. CYF caseworker Levan testified that terminating Father's parental rights would serve Child's needs and welfare, especially where she is bonded to her foster mother, is "loved and cared for in her [foster] home[, and where her foster mother] has been meeting all of [Child's] medical and educational needs." *Id.* at 29-31, 36.

---

[6] In July 2023, Mother filed a protection from abuse act (PFA) petition against Father. *Id.* at 38. The petition alleged that Father had pushed and "squeezed" Mother and allegedly injured Mother's finger. *See id.*, 11/25/25, at 45 (forensic psychologist testifying Mother's PFA petition alleged she "felt afraid and sought [a] medical examination" after incident with Father). No PFA order was in effect against Father at the time of the termination hearings. *Id.*

On November 26, 2025, the court entered an order involuntarily terminating Father's parental rights to Child pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[7]  Father filed a timely notice of appeal and a contemporaneous Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.  *See* Pa.R.A.P. 1925(a)(2)(i).  Father presents the following issues for our consideration:

(1)   Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Father's parental rights pursuant to [subsections] 2511(a)(1), (2), (5), and (8)?

(2)   Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYS met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of [C]hild pursuant to [section] 2511(b)?

Father's Brief, at 3.

In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.  The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  It is well[-]established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence[,] in light of the totality of the circumstances[,] clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted).  *See also In the Int. of K.T.*, 296 A.3d 1085 (Pa. 2023) (section 2511 requires bifurcated analysis where party seeking termination of parental

_____

[7] 23 Pa.C.S.A. §§ 2101-2938.

rights first bears burden of proving, by clear and convincing evidence, one of eleven grounds for termination under subsection 2511(a) exist before moving on to determine whether termination meets needs and welfare of child under subsection 2511(b)).

We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

Father claims that the court erred by terminating his parental rights under subsections 2511(a)(1), (2), (5), (8), and (b). After reviewing the parties' briefs, the certified record on appeal, and relevant statutory and case law, we conclude that Judge Spurgeon properly determined that Father's parental rights to Child should be involuntarily terminated. *In re A.R.*, *supra*. Father only cared for Child for the five months immediately following her birth. *See* N.T. Termination Hearing, 10/23/25, at 32. After Child was adjudicated dependent in June 2023, Father failed to visit Child in 2023 or 2024 or call CYF to schedule visits. *Id.* at 62. Over the life of this case, Father attended a total of four visits with Child in 2025. *Id.* Father never sent Child gifts or cards from April 2022 through June 2025. *Id.* at 80. Simply put, for the nearly 2½ years Child has been in foster care, Father has failed to perform parental duties. *See* 23 Pa.C.S.A. § 2511(a)(1).

Moreover, Child has been living, since her placement, in an approved pre-adoptive foster home with a foster mother to whom she is bonded, calls

"mom," and who provides for Child's developmental, physical, and emotional needs and welfare. *See id.* at § 2511(b). Finally, CYF caseworker Levan testified that terminating Father's parental rights would serve Child's needs and welfare. *See In the Int. of K.T.*, 296 A.3d at 1107 (under subsection 2511(b), courts must consider whether trauma of breaking any existing parent-child bond is outweighed by benefit of moving child toward permanent home); *In re T.S.M.*, 71 A.3d 251 (Pa. 2013) (existence of unhealthy and pathological parent-child bond severed in order to permit children be placed in healthy, permanent foster homes).

We rely upon Judge Spurgeon's opinion to affirm the order involuntarily terminating Father's parental rights to Child under subsections 2511(a)(1) and (b).[8] We instruct the parties to attach a copy of Judge Spurgeon's decision in the event of further proceedings in the matter.

Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 4/29/2026

---

[8] We can affirm the trial court's decision regarding the termination of parental rights with regard to any single subsection under 23 Pa.C.S.A. § 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). Even though we rely on the trial court to dispose of this appeal, we do so solely on the basis of affirming termination under subsections 2511(a)(1) and (b).

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA ORPHANS' COURT DIVISION

|  |  |  |
|---|---|---|
| Z.H.G., | : | |
|     MINOR CHILD, | : | CP-02-AP-0000035-2025 |
| | : | |
| APPEAL OF: | : | |
| | : | |
| | : | 1598 WDA 2025 |
| W.J.F., | : | |
|     FATHER. | : | |
| | : | **OPINION OF THE COURT** |

**By:**

The Honorable David L. Spurgeon
Allegheny County Court of Common Pleas
440 Ross Street, Suite 506
Pittsburgh, PA  15219

**Copies to:**

Counsel for CYF,
Jean M. Lupariello, Esquire
Voce Adoption Legal Services Project
445 Fort Pitt Blvd.
Fort Pitt Commons, Suite 101
Pittsburgh, PA  15219

Counsel for Child,
Erin Krotoszynski, Esquire
KidsVoice
437 Grant Street
Suite 700
Pittsburgh, PA  15219

Counsel for W.J.F. (Father),
John A. Adams, Esquire
206 S. Juliana St.
Bedford, PA  15522-1713

Counsel for A.A. (Mother)
Jeffrey K. Eisenberg, Esquire
Allegheny County Bar Foundation
Juvenile Court Project
Eleventh Floor, Koppers Building
436 Seventh Avenue
Pittsburgh, PA  15219-1841

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA ORPHANS' COURT DIVISION

| | |
|---|---|
| Z.H.G.,<br>　　MINOR CHILD,<br><br>APPEAL OF:<br><br>W.J.F.,<br>　　FATHER. | CP-02-AP-0000035-2025<br><br>1598 WDA 2025<br><br>**OPINION OF THE COURT** |

Spurgeon, J.                                                 1/14/2026

<u>OPINION</u>

On November 25, 2025, the court issued an order terminating the parental rights of A.A. ("Mother") and W.J.F. ("Father") with respect to their child, Z.H.G. ("Child"). The court found that grounds existed to terminate Mother's parental rights pursuant to 23 Pa. C.S. § 2511(a)(2), (a)(5), and (a)(8). The court found that grounds existed to terminate Father's parental rights pursuant to 23 Pa. C.S. § 2511 (a)(1), (a)(2), (a)(5), and (a)(8). The court then concluded that terminating Mother's and Father's parental rights served the Child's needs and welfare pursuant to 23 Pa. C.S. § 2511(b).[1]

---

[1] Mother did not appeal the November 25, 2025 Order of Involuntary Termination of Parental Rights. However, the court will discuss interrelated issues between Mother and Father that affected the court's decision.

2

## PROCEDURAL AND FACTUAL HISTORY

At the termination hearing, Child was represented by legal counsel, Erin Krotoszynski, Esquire, of KidsVoice. The court found no conflict existed at the scheduling date as well as the hearing date.[2]

Father appealed the Order of Involuntary Termination of Parental Rights and filed a Notice of Appeal on December 14, 2025. Father Concise Statement of Matters Complained of on Appeal alleges two errors: first, Father asserts that the court erred when it concluded that clear and convincing evidence existed to terminate his parental rights under 23 Pa. C.S. § 2511(a)(1), (a)(2), (a)(5), and (a)(8), and second, Father alleges the court erred when it ruled, pursuant to 23 Pa. C.S. §2511(b), that termination of his parental rights would best serve the needs and welfare of the Child.

Child, born on November , 2021, to Mother and an unknown father, came to the attention of the Allegheny County Office of Children, Youth and Families ("CYF") on or around April 12, 2023 at 8:00 pm, when Mother, who was later determined to be intoxicated, was found passed out on a bus shelter bench at the corner of Liberty Avenue and Ella Street in the City of Pittsburgh, Pennsylvania.

---

[2] See CYF Exhibit 1: Court Order Appointing Guardian Ad Litem at Docket In re: Z.J.F. CP-02-DP-0000200-2023; *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020); *In re A.C.M.*, 333 A.3d 704, 708 (Pa. Super 2025)

3

Child, who at that time was 16 months old, was present and unattended in a stroller.[3] Pittsburgh Police and paramedics arrived and Mother, who was holding onto the stroller, released it, and attempted to flee.[4] Police and paramedics had to grab the stroller as it was headed towards traffic.[5] Mother was later criminally charged in relation to the incident.[6]

On April 13, 2023, CYF moved for an Emergency Custody Authorization ("ECA"). On April 14, 2023, after a Shelter Hearing, the court removed Child from her biological home and placed in the foster home of B.G.[7] Child has been in this foster home since her removal, or approximately 2 ½ years.[8]

At the Shelter Hearing, Mother was ordered to undergo a mental health evaluation[9], a drug and alcohol evaluation, a POWER assessment, comply with recommendations, submit to random screenings, and resolve her pending criminal charges.[10] Father was not present at the Shelter Hearing and his whereabouts were unknown to CYF.[11]

---

[3] Trial Transcript ("T.T.") 10/23/2025 at 19
[4] Id.
[5] Id.
[6] Id.
[7] Id.
[8] Id., See also CYF Exhibit 1 (Shelter Care Order: 04/14/2023)
[9] It was learned from the forensic evaluation that Mother was diagnosed with schizophrenia. T.T. at 22
[10] T.T. 10/23/2025 at 20, CYF Exhibit 1 (Shelter Care Order: 04/14/2023)
[11] Id.

4

Father made himself known to CYF and the court for the first time at the Adjudication of Dependency Hearing on June 7, 2023.[12] The court ordered Father to attend Child's medical appointments, receive an assessment by CYF, maintain contact with CYF as well as notify CYF of any changes in address and telephone number, engage with a father engagement specialist ("FES"), and obtain housing.[13]

CYF conducted family plan meetings to assist the family with goals. CYF scheduled five meetings, and Father did not attend.[14] Father never presented himself to be assessed by CYF and the agency did not know of his whereabouts until he appeared at the adjudication hearing.[15]

Father did not maintain contact with CYF.[16] Visitation with Child has never advanced from supervised and have remained at Wesley Family Services.[17] On January 26, 2024, the court found that aggravated circumstances existed as to Father because he did not have any contact with Child for over six months.[18] CYF arranged for Father to have visits with Mother and Child as well as solely with Child at Wesley Family Services; however, no visits occurred until 2025 when he attended four visits with Mother and Child, but no one-on-one visits.[19]

---

[12] Id., CYF Exhibit 1 (Order of Adjudication and Disposition: 06/07/2023)
[13] T.T. 10/23/2025 at 20-21, CYF Exhibit 1 (Order of Adjudication and Disposition: 06/07/2023)
[14] T.T. 10/23/2025 at 24
[15] Id., T.T. 10/23/2025 at 39
[16] T.T. 10/23/2025 at 25
[17] Id.
[18] T.T. 10/23/2025 at 27, CYF Exhibit 1 (Aggravated Circumstances Order: 06/26/2024)
[19] T.T. 10/23/2025 at 27-28

CYF identified intimate partner violence ("IPV") as an issue between Mother and Father. Father was ordered to participate in IPV classes and never completed.[20] CYF learned that Father was the perpetrator of intimate violence and that it was an ongoing concern for the agency that went unaddressed.[21] In July 2023, Mother filed a Protection from Abuse ("PFA") petition against Father and more recently in September 2025.[22] Although a final PFA was not pursued by Mother, neither parent completed the court ordered IPV treatment.[23]

CYF learned that Father moved out of the state, one time in October 2023 and he returned in April 2024.[24] Father moved out of state a second time in 2025, after he ceased his visits with Child in August, 2025.[25] During both periods of relocation, Father never noticed CYF of his relocation out of state nor sought means to meet his reunification goals out of this jurisdiction.[26]

Father was individually evaluated by Dr. Eric Bernstein, Psy.D. on July 24, 2025.[27] Father revealed to Dr. Bernstein that he moved to Florida sometime between 2022 and 2023, and moved back to Pittsburgh, PA in late 2023.[28] Father

---

[20] T.T. 10/23/2025 at 28
[21] T.T. 10/23/2025 at 35
[22] T.T. 10/23/2025 at 38
[23] Id.
[24] T.T. 10/23/2025 at 34
[25] T.T. 10/23/2025 at 35, 40
[26] T.T. 10/23/2025 at 41
[27] CYF Exhibit 4 (Dr. Bernstein Evaluation)
[28] Id.

told Dr. Bernstein that he had no contact with Child while in Florida.[29] Father reconnected with Child in 2025, two years after returning to Pittsburgh, PA.[30]

Father endorsed Mother as a "very good" mother. Father defended Mother and characterized her mental health as "fine".[31] Father objected to Child's removal and accused foster mother of negligence.[32] Father related his parenting plan was to raise Child together with Mother.[33]

Father failed to mention any issues of domestic violence between he and Mother.[34] Father did acknowledge a prior PFA filed against him by a "female friend" as he described the incident as "non-violent" as he "only shoved her".[35]

The court conducted eight (8) Permanency Review Hearings ("PRH") on the following dates: September 21, 2023, December 14, 2023, March 20, 2024, June 26, 2024, October 23, 2024, February 6, 2025, May 29, 2025, and the final PRH on August 21, 2025. The court made specific findings at each of the PRH(s).

---

[29] Id.
[30] Id.
[31] Id.
[32] Id.
[33] Id.
[34] Id.
[35] Id.

At the time of the filing of the TPR petition, Father did not complete any of the court ordered goals.[36] Likewise, Father's compliance fluctuated between non-compliance and minimal compliance throughout the lifetime of the case.[37]

The hearings on the TPR Petition were held on October 23, 2025 and November 25, 2025. The court heard testimony from the following witnesses:

- Krisitian Levan - Allegheny County CYF, Caseworker;

- Christelle Deffenbaugh – Wesley Family Services, Foster Care Coordinator;

- Heidi Hysong – Allegheny County CYF, Permanency Caseworker;

- Eric Bernstein, Psy.D. – Forensic Child Psychologist;

- Mother;

- Father.

The court admitted the following exhibits into the record:

- CYF Exhibit 1: Combined Court Orders

- CYF Exhibit 2: Combined Family Plans

- CYF Exhibit 3: Visitation Log Summary

- CYF Exhibit 4: Expert Evaluation by Dr. Bernstein

---

[36] T.T. at 30
[37] Id.

8

The evidence at the hearing established that during the time between the Child's adjudication and CYF's filing of the TPR petition, Father failed to address the reunification goals identified in the court's orders.

It was based on the above that the court terminated Father's rights pursuant to 23 Pa. C.S. §2511(a)(1), (a)(2), (a)(5) and (a)(8) and (b).

On December 14, 2025, Father filed his Notice of Appeal. Father's Concise Statement of Matters Complained of on Appeal alleged:

1. The trial court abused its discretion and/or committed an error of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa. C.S.A. §2511(a)(1)…

2. The trial court abused its discretion and/or committed an error of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa. C.S.A. §2511(a)(2)…

3. The trial court abused its discretion and/or committed an error of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa. C.S.A. §2511(a)(5)…

4. The trial court abused its discretion and/or committed an error of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa. C.S.A. §2511(a)(8)…

5. The trial court abused its discretion and/or committed an error of law in finding CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the Children pursuant to 23 Pa. C.S.A. §2511(b) when the record does not support such a finding. Furthermore, CYF failed to meet its burden under 23 Pa. C.S.A. §2511(a) which precluded the trial court from making a finding under 23 Pa. C.S.A. §2511(b).

## STANDARD

The Standard for review in termination cases is well established.

> The standard of review in termination of parental rights cases requires appellate courts to "accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)

In a termination of parental rights proceeding, the best interests of the child is not the initial or only consideration, as the court must find that the statutory grounds for termination of parental rights have been met. *Kimock v. Jones*, 47 A 3d. 855 (Pa. Super. 2012)

CYF based its petition to terminate Father's parental rights pursuant to 23 Pa. C.S.A. §§2511 (a)(1), (a)(2), (a)(5), and (a)(8). These subsections provide for the involuntary termination of parental rights if the petitioner can establish any of the following grounds:

> (a)(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

10

(a)(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot be remedied by the parent.

(a)(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(a)(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and the termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§2511 (a)(1), (a)(2), (a)(5), and (a)(8).

Once the statutory grounds for involuntary termination of parental rights have been demonstrated by clear and convincing evidence, the court must consider whether the termination would meet the needs and welfare of the child under §2511 (b):

(b) Other considerations. – The court in terminating the rights of a parent shall give primary consideration to the development, physical and emotional needs, and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall

11

not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petitions.

23 Pa.C.S.A. §2511(b).

A party seeking termination of parental rights must establish by clear and convincing evidence that the parent's conduct satisfies at least one of the statutory grounds for termination; if it is determined that this burden of proof has been met, then the trial court must next consider the second step of the process, which entails a determination of whether termination best serves the needs and welfare of the child. *In re S.D.T., Jr.*, 934 A.2d 706 (Pa. Super. 2007). When determining whether termination of parental rights serves the child's needs and welfare, the court must examine the nature and status of any bond between the parent and the child and consider whether severing that bond would destroy a relationship that is "necessary and beneficial." *In re P.A.B.*, 570 A.2d 522, 525 (Pa. Super. 1990). Finally, the court must "conduct a full subsection (b) analysis focused on the child. The court must not truncate its analysis and preclude severance based solely on evidence of an "adverse" or "detrimental" impact to the child. Therefore, to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *In re K.T.*, 296 A.3d 1085, 1114 (Pa. 2023)

When reviewing an order terminating parental rights, the appellate court "is limited to determining whether the decision of the trial court is supported by

12

competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005) Furthermore, the trial court is "the sole determiner of the credibility of witnesses and resolves all conflicts in testimony." *Id.*

## DISCUSSION

To terminate parental rights, a trial court must first find clear and convincing evidence that grounds for termination exist under one of the eleven subsections of 23 Pa. C.S. §2511(a). *In re J.F.M.*, 71 A.3d 989 (Pa. Super. 2013). If grounds exist, the court must then consider, under 23 Pa. C.S. §2511(b), whether termination would best serve the Child's developmental, physical and emotional needs and welfare. On review, the Superior Court should find that competent evidence supports this court's decision. *Id.* at 992.

This court found separate grounds for termination of Father's parental rights, based on 23 Pa. C.S. §2511(a)(1), (a)(2), (a)(5), and (a)(8). Father seeks to challenge the sufficiency of the evidence under each respective subsection. The

court is only required to find one ground under 23 Pa. C.S. §2511(a) has been established to terminate a parent's rights.[38]

The court first addresses Father's appeal under 23 Pa. C.S.A. §2511 (a)(1). In the case at bar, from the time of Child's removal in April 2023 to the time of the filing of the TPR petition on March 14, 2025, the court found that Father refused to perform parental duties. Father was absent from Child's life for nearly four years. Father testified that he hadn't seen Child since 2022, which was the time of the Adjudication Hearing.[39] Father admitted that he hadn't spent any birthdays or holidays with Child.[40] Father never provided Child with any form of support, daily caregiving or gifts.[41] The record is clear that Father had no contact with Child and made no efforts until very recently to visit Child. Further, Father failed to maintain contact with CYF. At various points throughout this case, Father was missing and later identified as "relocated out of state". During these absences from Allegheny County, Father did not provide any contact information or maintain connection with Child. It is for these reasons the court finds that CYF met their burden under subsection (a)(1). Based upon the aforementioned, Father's refusal to parent is

---

[38] *In re Adoption of R.J.S.*, 901 A.2d 502, 516. n.3 (Pa. Super 2006) ("We emphasize that satisfaction of the requirements in only one subsection of Section 2511(a), along with consideration of the provisions in Section 2511(b), is sufficient for termination" (emphasis in original)
[39] T.T. 10/23/2025 at 79
[40] Id.
[41] T.T. 10/23/2025 at 80

evident over the last 31 months. The conditions that led to the need for dependency have not been remedied. Accordingly, CYF has proven by clear and convincing evidence under subsection (a)(2).

Next the court addresses Father's appeal under 23 Pa. C.S.A. §2511(a)(5) and (a)(8). In order to terminate under subsection (a)(5), the court must find that the Child has been removed by the court for a period of 6 months and the conditions that led to the Child's removal must still exist. Further, in order for the court to terminate under subsection (a)(8), the court must find that 12 months have elapsed since the Child's removal, the conditions continue to exist, and that termination would best serve the needs and welfare of the Child.

In this case, there is no dispute that Child had been in care the requisite period of time, six months and twelve months, respectively. Child was removed on April 13, 2023, and has never returned to her biological family. Child was ultimately placed in the foster home of B.G. and has remained in her care for 31 months at the time of the TPR hearing. The reasons the Child was removed continue to exist as will be more fully discussed below along whether the Child's best interest will be served by the termination of Father's parental rights.

In examination of whether Father remedied the conditions that led to the Child's removal from his care, the court has reviewed the record in its entirety and

15

has concluded that Father, after being provided with the services necessary, failed to meet his reunification goals.

In this case, the court accepted credible testimony from Caseworker Levan who was assigned to this family since the outset of the case on Apil 13, 2023.[42] Mr. Levan testified that CYF conducted family meetings where the agency identified goals. Mr. Levan outlined Father's goals to include: provide contact information to CYF in order to assess his needs, engage with a FES, address IPV issues, and attend supervised visits with Child.[43]

Caseworker Levan testified that Father's whereabouts were unknown until he appeared for the Adjudication Hearing.[44] Although Father provided a phone number to CYF, he never provided an address or any place of residence in order for the agency to complete an assessment.[45] Father was never assessed and his only form of contact with CYF was sporadic text messages.

Further, Father had no contact with Child for six months and on June 26, 2024, an Aggravated Circumstances Order was issued based on his failure of substantial and continuing contact with Child.[46]

---

[42] T.T. 10/23/2025 at 16
[43] T.T. 10/23/2025 at 21, CYF Exhibit 1 (Shelter Care Order: 04/14/2023)
[44] T.T. 10/23/2025 at 24
[45] Id.
[46] T.T. 10/23/2025 at 27

Father only began cooperating with CYF in 2025.[47] However, Father's efforts ceased again when he moved out of state that same year. Father did provide a valid a phone number.[48] Mr. Levan testified the agency went to the extreme effort to hire a private investigator service, CSI, Inc. to search for Father, to no avail.[49]

The court rejected Father's explanation for not having contact with the agency. Father testified that he and Mother lived together with Child for approximately five months and split up.[50] Father was arrested and was incarcerated for a period and upon his release, "he lost everything and he moved to Florida."[51] Father testified that upon his return to Pennsylvania, he had no contact information for Mother and later learned she was at the Sojourner Home. Father testified he had no idea of CYF's involvement until Mother provided him a letter from the agency.[52] Father acknowledged that he met with CYF caseworker Levan after the Adjudication Hearing.[53] Although meeting with CYF after that hearing, he testified he did not know that he was required to have visitation with Child.[54] Father did not seek independent visitation for his Child. Father further testified that he left Pennsylvania for "work reasons" but never explained those circumstances. Father

_____

[47] T.T. 10/23/2025 at 31
[48] T.T. 10/23/2025 at 33
[49] T.T. 10/23/2025 at 35
[50] T.T. 10/23/2025 at 70
[51] Id.
[52] T.T. 10/23/2025 at 71
[53] T.T. 10/23/2025 at 72
[54] Id.

17

explained that for time periods he did not have a phone and does not have a valid phone at the time of the TPR hearing.[55] Father admitted that between the time of the adjudicatory hearing and the time he left for Florida in late October 2023, Father did nothing to meet his goals. He did not see his daughter during that time.[56]

Father failed to meet his goal of visitation. Father was permitted to have supervised visits with Child. Over the life of the case, Father had only four visits that were with Mother present. Father completed no independent visits with Child.[57] During Father's time spent in Florida he did not visit in any form, including requesting virtual visits through CYF. Father's visits remained supervised the entire life of the case.

Father was supposed to connect with the Father Engagement Specialist. Father was assigned a specialist but never engaged.[58] The specialist made attempts to contact Father but he was unable to connect.[59]

Father did not address the goal of IPV treatment in Pennsylvania or Florida. Caseworker Levan testified that there were ongoing concerns of intimate partner violence.[60] Father was the perpetrator of the violence and not the victim.[61]

---

[55] T.T. 10/23/2025 at 73, 80
[56] T.T. 10/23/2025 at 77
[57] T.T. 10/23/2025 at 58, 82
[58] T.T. 10/23/2025 at 32
[59] Id.
[60] Id.
[61] Id.

The court concluded that Father provided no credible evidence or testimony to demonstrate that he addressed the goals relevant to Child's removal. Further, Father failed to recognize or act on his parental duties through his scant and limited interactions with CYF and the Child. No competent evidence exists to the contrary.

The court found CYF provided Father with all the support necessary to meet his court ordered goals. Additionally, CYF has provided Father with all necessary services to remedy the conditions that led to the Child's removal. Father chose to not take advantage of those supports and services; instead, Father chose to remove himself from Child's life by moving to Florida multiple times and never contacted Child or CYF to notify the agency of his whereabouts. Given the above, it is clear that the conditions that led to removal have not been remedied and therefore reunification is not imminent. Having examined the entire history of the case in the totality of the circumstances, the court justifiably concluded that the evidence established the first two elements required by 23 Pa. C.S. §2511 (a)(8).[62] The court will address the third element, that termination serves the Child's needs and welfare below.

---

[62] *In re Adoption of R.J.S.*, 901 A.2d at 511 ("To satisfy this subsection, [CYF] must show only (1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child.")

19

The second prong of the analysis concerns whether CYF has proven that termination is in the Child's best interest pursuant to 23 Pa. C.S.A. §2511(b). In relevant part, 23 Pa. C.S.A. §2511(b) requires the court to give "primary consideration to the developmental, physical and emotional needs and welfare of the child" when terminating the rights of a parent.

As discussed by the Superior Court [in] *In re N.A.M.*, the inquiry into whether terminating a parent's rights serves the best interest of the child's needs and welfare necessitates an inquiry into the nature and status of any bond between the parent and child and the effect of severing that bond if it exists:

> However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008)
>
> While a parent's emotional bond with his or her child is a major aspect of subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008) The mere existence of an emotional bond does not preclude the termination of parental rights. See *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination 'would destroy an existing, necessary and beneficial relationship.'

*In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003)

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011); see also *In Re K.Z.S.*, 946 A.2d 753 (Pa. Super. 2008) (discussing proper analysis of parent-child bond in terminating parental rights)

*In re E.M.*, 533 Pa. 115, 620 A.2d 484 (1993) and its progeny have shaped the traditional subsection (b) analysis and calls for interpretation of any child bond. With respect to this determination, as set forth above, this court conducted a parent-child bond analysis. In so doing, the court is not required to use expert testimony and may rely upon the evaluations of social workers and caseworkers as well. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). The effect of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008)

More recently, our Supreme Court held that the court must "conduct a full subsection (b) analysis focused on the child. The court must not truncate its analysis and preclude severance based solely on evidence of an "adverse" or "detrimental" impact to the child. Therefore, to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *In re K.T.*, 296 A.3d 1085, 1114 (Pa. 2023)

Whether a child's primary emotional attachment is with a foster parent rather than a birth parent is a significant factor in evaluating the child's developmental needs and welfare. *In re K.M.*, 53 A.3d 781, 792 (Pa. Super. 2012)

Dr. Bernstein conducted an analysis respective to foster mother and Child as well as Mother and Child. The court found that Child's primary bond was with the foster mother. The court had the benefit of an interactional interview between foster mother and Child, and an individual interview with Father. The court notes that Father did not avail himself for an interactional between himself and Child. The court gave significant weight to the testimony of Dr. Bernstein, an expert in child and forensic psychology, in reaching its conclusion. The court also considered testimony of: CYF caseworker Kristian Levan, who had the opportunity to interact and observe the parties for the past 2 ½ years; Christelle Deffenbaugh, a foster care coordinator at Wesley Family Services; and Heidi Hysong a permanency caseworker employed by CYF.

As it pertained to a bond, Dr. Bernstein evaluated the relationship between foster mother and Child. Dr. Bernstein characterized their attachment as secure.[63] It was clear to him that Child was comfortable around her foster mother, that she was playful, verbal and engaged.[64] Dr. Bernstein testified that foster mother provided Child with appropriate support and supervision.[65]

The court also weighed the testimony of the Christelle Deffenbaugh who had an opportunity to observe Child in the foster mother's home. Ms. Deffenbaugh

---

[63] T.T. 11/25/2025 at 36
[64] Id.
[65] Id.

22

testified that Child refers to foster mother as "mom".[66] She observed Child being playful and talkative with foster mother. She described the love and affection, comfort and support foster mother provides child.[67] Further, Ms. Deffenbaugh testified that based on her observation of Child in foster mother's s home, it was clear that Child's needs were being met.[68]

The same observations were made by CYF permanency caseworker Heidi Hysong. As a permanency caseworker, Ms. Hysong completes the home study for any pre-adoptive home. Ms. Hysong had a firsthand opportunity to evaluate how Child behaves in the foster home. Ms. Hysong testified that she had been to the home six times and observed Child and foster mother interact.[69] Pertaining to bond, Ms. Hysong testified that Child is "very bonded" to her. She observed Child to be "bound to her side" and does not like to leave her.[70] The court finds this testimony to be credible and corroborated by the other witnesses' observations.

Father did not complete an interactional with Child. Dr. Bernstein's expert opinion is limited relating to direct questions regarding permanency for Father; however, Dr. Bernstein was able to provide expert testimony of the general topics of permanency and bond.[71] Father's failure to engage in an interactional evaluation

---

[66] T.T. 10/23/2025 at 59
[67] Id.
[68] Id.
[69] T.T. 10/23/2025 at 64
[70] T.T. 10/23/2025 at 65
[71] T.T. 11/25/2025 at 39, 54

during this important phase of the termination process demonstrated to the court Father's unwillingness to be engaged in the best interest of his Child. Dr. Bernstein testified that he was concerned because of Father's inconsistent involvement with Child, his desire to be in a relationship with Mother despite the unstable nature of their relationship and its impact on Child especially in light of the remaining concerns of IPV.[72]

Father had gone fifteen months without seeing Child.[73] Dr. Bernstein opined that a bond is formed over a period of time whereby an individual provides consistent, quality, and dependable interactions in a way that fosters support and is expressed through affection, openness, and love to the degree that trust is established.[74] Dr. Bernstein opined that consistency is not a mathematical equation, but is a connection that occurs which is highly dependent upon predictability and in combination of quality and love.[75] Here, Father only had four visits with Child over the lifetime of the case. There were no other contacts with Child. This court rejected Father's rationale that his move to Florida prevented visitation. Father made no substantial effort to maintain contact with CYF nor contacted CYF to inquire about the well-being or safety of his Child. Further, Father testified that he

---

[72] T.T. 11/25/2025 at 40, 45
[73] Id.
[74] T.T. 11/25/2025 at 54
[75] T.T. 11/25/25 at 55

24

returned to Allegheny County several times yet failed to assume any parenting responsibilities or visit his Child.[76] Dr. Bernstein characterized the four visits as inconsistent and was unable to assess the quality interactions.[77]

As it pertains to the needs and welfare, Caseworker Hysong testified that the foster home is meeting all of the Child's needs.[78] Child is almost four years old at this point.[79] Foster mother has Child enrolled in a pre-school type daycare, which Child seems to enjoy.[80] The foster home furnishes Child with age-appropriate toys and is meeting all of her needs.[81]

Foster mother interacts with Child and plays with her as "any parent would do".[82] Foster mother is providing all of Child's emotional, physical, and medical needs according to the firsthand observations made by Ms. Hysong. It was recommended by Ms. Hysong that foster mother be an adoptive resource.[83] Dr. Bernstein also found a strong and healthy bond with foster mother.[84]

Ms. Deffenbaugh testified about bond between Father and Child. The court placed very little weight on her explanation as she was comparing the interactions

---

[76] T.T. 10/23/2025 at 77
[77] T.T. 11/25/2025 at 55
[78] T.T. 10/23/2025 at 65
[79] T.T. 10/23/2025 at 66
[80] Id.
[81] Id.
[82] Id.
[83] T.T. 10/23/2025 at 67
[84] T.T. 11/25/2025 at 46

between Child and both parents.[85] The court concluded after weighing Dr. Bernstein's definition of bond with Ms. Deffenbaugh's testimony, that if any bond existed with Father, it is very minimal.

The court weighed foster parent's ability to care for Child versus Father's. The court further examined the extent of Child's individual needs and welfare in the context of the length of time she has been in an intact home within a well-functioning family unit. The court also considered the fact that Father had minimal participation in the Child's life 26 months ago. During this time, Father did not fulfill any parental duties nor inquire as to her well-being or the means of her care.

Father presented no evidence to convince the court that he is in any position now, or in the near future to parent. Father demonstrated throughout the life of the case that he is unwilling and unable to parent. In fact, Father averred that Child should be placed with Mother and did not present himself as a ready, willing and able parent. His proposed parental role was barely as a co-parent with Mother. Although Mother did not appeal, this court found based upon her appearing in court and testifying, that she continued to have severe unaddressed mental health issues and is not a suitable parent as her rights have been terminated.[86]

---

[85] T.T. 10/23/2025 at 55
[86] T.T. 10/23/25 1-15

The court gave primary consideration to the developmental, physical, and emotional needs and welfare of the Child. The court examined whether there may have been a minimal bond between Father and Child as part of its best-interest analysis, but that is only one of many factors the court considered in making its determination.

The court also examined the safety needs of the Child as well as other intangibles that the Child has with the foster mother, such as love, comfort, security and stability. The court's determination included the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the Child. The court concluded that trust and emotional support rests with foster mother. Focusing on the perspective of the Child, the Child enjoys a special relationship with foster mother and any bond with Father is no longer necessary or beneficial.

The court finds that competent evidence exists that the family ties no longer help, but in fact hinder Child. The court relied upon the expert opinion and found that Child will not suffer extreme and emotional consequences by severing the bond between each Child and Father. The court also considered whether termination of the parental rights would destroy something positive. The court finds that the termination is in the best interest of Child because Father has proven unwilling and unable to parent.

27

The Child in this case deserves permanency and has been in care for thirty-one (31) months. The courts must keep in mind the ticking clock of childhood. "Children are young for a scant number of years and we have an obligation to see their development quickly." *In re R.W.*, 2018 WL 3423812 (Pa. Super. 2018)

The Commonwealth has an interest not only in family reunification, but also to the child's right to a stable, safe and healthy environment. *In re B.L.W.*, 843 A.2d 380 (Pa. Super. 2004) appeal denied, 963 A.2d 1141 (Pa. 2004).

Therefore, the evidence established that termination will be able to provide the Child with much needed stability and permanence at her age, and this court concludes that the developmental, physical, and emotional needs and welfare of Child would be best served by terminating Father's parental rights under 23 Pa. C.S.A. §2511(b).

## CONCLUSION

The evidence discussed above amply supports the court's conclusion that the Child has been in care for thirty-one (31) months, and at the time of the filing of the petition, Father was not meeting any of the Child's needs. The conditions that caused dependency continued to exist for Father. The Child is part of a foster family that provides love, comfort, stability and security. The role of psychological parent exists with foster parent. Child's primary attachment is to the foster parent.

28

Removing the Child from her foster parent would have detrimental effects.

Termination serves the needs and welfare of Child. Therefore, for these reasons,

the court's order should be affirmed.

BY THE COURT:

_____, J.